
UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CELESTINO DAVID CARLOS, <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, <br> Acting Commissioner of Social Security Administration, <br><br> Defendant. | Case No. CV 14-2444-SP <br><br><br> MEMORANDUM OPINION AND ORDER |

## I.

## **INTRODUCTION**

On April 1, 2014, plaintiff Celestino David Carlos filed a complaint against the Commissioner of the Social Security Administration ("Commissioner"), seeking a review of a denial of supplemental security income ("SSI") benefits. Both plaintiff and defendant have consented to proceed for all purposes before the assigned Magistrate Judge pursuant to 28 U.S.C. § 636(c). The court deems the matter suitable for adjudication without oral argument.

Plaintiff presents three issues for decision: (1) whether the administrative law judge ("ALJ") properly considered plaintiff's credibility; (2) whether the ALJ properly considered the opinions of treating psychiatrist Dr. William F. Quirk and examining psychiatrist Dr. Jarvis Ngati; and (3) whether the ALJ erred in failing to find plaintiff suffers from a legally severe personality disorder. Memorandum in Support of Plaintiff's Complaint ("P. Mem.") at 12-22; Memorandum in Support of Defendant's Answer ("D. Mem.") at 12-23.

Having carefully studied the parties' papers, the Administrative Record ("AR"), and the decision of the ALJ, the court concludes that, as detailed herein, the ALJ properly considered plaintiff's credibility and the opinions of plaintiff's physicians, but failed to properly address plaintiff's diagnosed severe personality disorder. Consequently, this court remands the decision of the Commissioner denying benefits.

## II.

## **FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff, who was thirty-three years old on his alleged onset of disability date, has an eighth grade education. AR at 48, 168, 596. He has no past relevant work. *Id.* at 30, 49, 55, 211, 228-29.

On April 6, 2010, plaintiff applied for SSI, alleging he has been disabled since May 21, 2007 due to substance induced mood disorder, anti-social personality disorder, depression, schizophrenia, bipolar disorder, and anxiety. *Id.* at 168, 239, 267. Plaintiff's applications were denied initially and upon reconsideration, after which he filed a request for a hearing. *Id.* at 68-70, 78-79, 81.

On January 24, 2012, plaintiff, represented by an attorney, appeared and testified at a hearing before the ALJ. *Id.* at 44-55. The ALJ also heard testimony from vocational expert Randi Langford-Hetrick. *Id.* at 55-61.

On May 3, 2012, the ALJ denied plaintiff's claim for benefits. *Id.* at 32. Plaintiff filed a timely request for review of the decision, which the Appeals Council denied. *Id.* at 1-6.

Applying the well-known five-step sequential evaluation process, the ALJ found, at step one, that plaintiff had not engaged in substantial gainful activity since April 6, 2010, the application date.[1] *Id.* at 25.

At step two, the ALJ found that plaintiff suffered from the severe impairments of depression, paranoid schizophrenia, and history of polysubstance dependance. *Id.*

At step three, the ALJ found that plaintiff's impairments, whether individually or in combination, did not meet or medically equal one of the listed impairments set forth in 20 C.F.R. part 404, Subpart P, Appendix 1 (the "Listings"). *Id.*

The ALJ then assessed plaintiff's RFC,[2] and determined that plaintiff had the RFC to perform a full range of work at all exertional levels but with the non-exertional limitations that plaintiff could perform simple, repetitive work that involves no contact with the general public, and only minimum contact with supervisors and co-workers. *Id.* at 26.

---

[1] Although plaintiff alleges he has been disabled since May 21, 2007, he was ineligible for benefits until he was released from prison, which occurred shortly after his application date. *See* 42 U.S.C. §§ 402(x)(1)(A), 1382(e)(1)(A); AR at 49-50; *see also* AR at 27-28.

[2] Residual functional capacity is what a claimant can do despite existing exertional and nonexertional limitations. *Cooper v. Sullivan*, 880 F.2d 1152, 1155-56 n.5-7 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007).

The ALJ found, at step four, that plaintiff had no past relevant work. *Id.* at 30.

At step five, the ALJ found there were jobs that existed in significant numbers in the national economy that plaintiff could perform, including hand packager, night cleaner, and machine feeder. *Id.* at 31. Consequently, the ALJ concluded that plaintiff did not suffer from a disability as defined by the Social Security Act. *Id.* at 32.

The ALJ's decision stands as the final decision of the Commissioner.

## III.

## STANDARD OF REVIEW

This court is empowered to review decisions by the Commissioner to deny benefits. 42 U.S.C. § 405(g). The findings and decision of the Social Security Administration must be upheld if they are free of legal error and supported by substantial evidence. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001) (as amended). But if the court determines that the ALJ's findings are based on legal error or are not supported by substantial evidence in the record, the court may reject the findings and set aside the decision to deny benefits. *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001).

"Substantial evidence is more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. Substantial evidence is such "relevant evidence which a reasonable person might accept as adequate to support a conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *Mayes*, 276 F.3d at 459. To determine whether substantial evidence supports the ALJ's finding, the reviewing court must review the administrative record as a whole, "weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion." *Mayes*, 276 F.3d at 459. The ALJ's decision "'cannot be

affirmed simply by isolating a specific quantum of supporting evidence.'" *Aukland*, 257 F.3d at 1035 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). If the evidence can reasonably support either affirming or reversing the ALJ's decision, the reviewing court "'may not substitute its judgment for that of the ALJ.'" *Id.* (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)).

## IV.

## DISCUSSION

### A. The ALJ Properly Discounted Plaintiff's Credibility

Plaintiff contends that the ALJ failed to make a proper credibility finding. P. Mem. at 1, 10-14. Specifically, plaintiff argues the ALJ's reasons for finding him less credible were not clear and convincing. *Id.* Plaintiff is assessing the ALJ's finding under the wrong standard.

The ALJ must make specific credibility findings, supported by the record. Social Security Ruling 96-7p.[3] To determine whether testimony concerning symptoms is credible, the ALJ engages in a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, the ALJ must determine whether a claimant produced objective medical evidence of an underlying impairment "'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). Second, if there is no evidence of malingering, an "ALJ can reject the claimant's testimony about the severity of her symptoms only

---

[3] "The Commissioner issues Social Security Rulings to clarify the Act's implementing regulations and the agency's policies. SSRs are binding on all components of the SSA. SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." *Holohan v. Massanari*, 246 F.3d 1195, 1203 n.1 (9th Cir. 2001) (internal citations omitted).

5

by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003). But if the record provides affirmative evidence of malingering, the ALJ is not required to provide clear and convincing reasons for discounting plaintiff's credibility. *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir.2006); *Morgan v. Comm'r*, 169 F.3d 595, 599 (9th Cir.1999)).

At the first step, the ALJ found claimant's medically determinable impairments could be expected to cause the alleged symptoms. AR at 27. At the second step, the ALJ found evidence of malingering. *Id.* at 27-28. Malingering is defined as "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs." D. Mem. at 21 n.5 (citing AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 739 (4th ed. 1994) (hereinafter "DSM-IV")).

Citing to plaintiff's prison mental health file, the ALJ noted plaintiff was "found to be manipulating in order to get better housing in prison." AR at 27. The records specifically states, "[patient] now presents as malingering," when plaintiff recanted a claim of being suicidal – which he made in an effort to be moved from the general population – because he wanted to avoid being placed in the drug treatment program. *Id.* at 384. The ALJ also cited to prison records noting plaintiff's history of manipulating suicidal ideation "to get meds." *Id.* at 27, 386. The ALJ highlights plaintiff's admission that "people think [he is] manipulating" (*id.* at 27), and plaintiff does not deny his long history of being deemed a malingerer. *See P. Mem.* at 4-6, 15, 21 (detailing plaintiff's history of exaggeration for gain and arguing it is a result of his mental illness); *infra*

6

Section IV.C (considering plaintiff's argument that the ALJ failed to account for, or address, plaintiff's serious personality disorder).

Several treating and examining psychologists documented their discounting of plaintiff's credibility. In January 2010, Dr. Schwab noted plaintiff's manipulation of staff to have himself deemed learning disabled and thereby avoid school in prison. AR at 561. On an earlier occasion, when plaintiff was confronted with the fact that his testing showed he performed on a ninth grade level, plaintiff claimed another inmate took the test for him. *Id.* at 491. Notable differences in plaintiff's presentation depending on the prison context or setting caused one of his treating psychologists to "believe he [was] malingering his difficulties." *Id.* at 467. Dr. Webber's March 2010 evaluation of plaintiff concludes by stating the inmate "appears to be manipulating while in custody for easy treatment." *Id.* at 597. Dr. Brooks analysis of plaintiff conducted in March 2011 refers to a September 2010 review of plaintiff's records which revealed plaintiff's "highly manipulative behavior seemingly for secondary gain." *Id.* at 696; see *id.* at 618. In March 2012 while documenting the results of several psychological tests, Dr. Pierce noted plaintiffs intentional failure to perform at full capacity and remarked, plaintiff was an "uncertain quality historian, for concerns with effort seen throughout the mental status and testing." *Id.* at 758, 760, 763.

In sum, the ALJ was not required to present clear and convincing reasons for finding plaintiff's subjective complaints not credible because he cited evidence of malingering in a record replete with such instances. *See Carmickle*, 533 F.3d at 1160. But whether the ALJ properly accounted for any underlying mental disabilities that may be responsible for plaintiff's malingering is a separate issue considered below. *See infra* Section IV.C.; *Carr v. Astrue*, 2009 WL 3112400, at *8 (E.D. Cal. Sept. 23, 2009) ("Even though the ALJ determined that Plaintiff was

7

malingering, the record contains evidence that Plaintiff suffered from significant social limitations that were caused by a documented, and separate, mental disorder.").

**B.     The ALJ Properly Considered the Medical Opinions**

Plaintiff contends the ALJ improperly rejected the opinion Dr. William F. Quirk and selectively disregarded parts of Dr. Jarvis Ngati opinion which was otherwise given "great weight." P. Mem. at 16-20. Plaintiff argues that the reasons the ALJ provided for discounting these opinions were not specific and legitimate or supported by substantial evidence. *Id.* at 16.

In determining whether a claimant has a medically determinable impairment, among the evidence the ALJ considers is medical evidence. 20 C.F.R. § 404.1527(b). In evaluating medical opinions, the regulations distinguish among three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 404.1527(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. § 404.1527(c)(1)-(2). The opinion of the treating physician is generally given the greatest weight because the treating physician is employed to cure and has a greater opportunity to understand and observe a claimant. *Smolen*, 80 F.3d at 1285; *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Nevertheless, the ALJ is not bound by the opinion of the treating physician. *Smolen*, 80 F.3d at 1285. If a treating physician's opinion is uncontradicted, the ALJ must provide clear and convincing reasons for giving it less weight. *Lester*, 81 F.3d at 830. If the treating physician's opinion is contradicted by other opinions, the ALJ must provide specific and legitimate reasons supported by

substantial evidence for rejecting it. *Id.* Likewise, the ALJ must provide specific and legitimate reasons supported by substantial evidence in rejecting the contradicted opinions of examining physicians. *Id.* at 830-31. The opinion of a non-examining physician, standing alone, cannot constitute substantial evidence. *Widmark v. Barnhart*, 454 F.3d 1063, 1067 n.2 (9th Cir. 2006); *Morgan*, 169 F.3d at 602; *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993).

### 1. Dr. Quirk's December 6, 2011 Opinion

Although the ALJ noted Dr. Quirk's "mental status examination" was generally consistent with those of Dr. Sawant and Dr. Ngati (AR at 30), Dr. Quirk's conclusions were not. Dr. Quirk found plaintiff had marked limitations in most mental activities (*id.* at 29, 746-48), whereas other physicians found more moderate limitations. *See id.* at 30, 606-07, 763. Thus, the ALJ was required to provided specific and legitimate reasons, supported by substantial evidence, for discounting Dr. Quirk's December 6, 2011 opinion. *Lester*, 81 F.3d at 830.

An ALJ may appropriately reject a treating physician's medical opinion by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citing *Magallanes*, 881 F.2d at 751). Contrary to plaintiff's characterization, the ALJ's analysis does not consist of six separate rationales for rejecting Dr. Quirk's opinion. *See* P. Mem. at 16-19. The ALJ set out a detailed summary of the facts including a chronological history of plaintiff's mental health status and clinical diagnoses. AR at 28-30. As described below, he highlights evidence that conflicts with Dr. Quirk's opinion. *See id.* at 29. He provides his interpretation of these facts, stating "it is reasonable to conclude that the claimant would require psychiatric hospitalization" if he was limited to the extent

reported,[4] and noting "subsequent mental treatments do not show greater evidence of mental limitations." *Id.* The ALJ's determination that Dr. Quirk's opinion warrants no weight is "more than [an] offer [of] his conclusions." *Reddick*, 157 F.3d at 725. The ALJ "set forth his own interpretations and explain[ed] why they, rather than the doctors', are correct." *Id.* (citing *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988)).

On December 5, 2011 plaintiff was seen by psychiatrist Dr. William F. Quirk at the Mental Health America ("MHA") facility where plaintiff began receiving treatment and case management after his release from parole. AR at 28, 695, 729-32; P. Mem. at 7-8. Dr. Quirk found plaintiff to be "well groomed, [with] good hygiene, [and] moderately agitated." AR at 738. During the examination, plaintiff made "fair" eye contact, acted "a little depressed," and had paranoid thoughts, but showed no signs of suicidal or homicidal ideation or hallucinations. *Id.* Dr. Quirk's mental status examination and Global Assessment of Functioning ("GAF")[5] rating of 55 was reasonably similar to the findings of other psychologists and psychiatrists (*id.* at 743; *see id.* at 567 (rating plaintiff's GAF a 49 in October 2009), *id.* at 564 (rating plaintiff's GAF a 55 in January 2010), *id.* at 597 (rating plaintiff's GAF a 65 in March 2010), *id.* at 606 (rating

---

[4] It is unclear if the ALJ mistakenly or intentionally refer to Dr. Sawant's opinion and Global Assessment of Functioning ("GAF") rating of plaintiff during his discussion of Dr. Quirk's opinion. *See* AR at 29. Plaintiff contends the ALJ "mistakenly referred to [Dr. Quirk] as Dr. Sawant." P. Mem. at 17. But even assuming the reference is intentional, the ALJ's analysis is not undermined; plaintiff was not hospitalized by either doctor and both rated plaintiff as displaying moderate symptoms on the GAF scale. *Id.*

[5] The GAF scale is designed to provide psychiatrists a method of scoring and comparing patients' functional capacity in light of diagnoses. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 1994); P. Mem. at 5-9 nn.2-4; D. Mem. at 1-3 nn.1-3.

plaintiff's GAF a 48-50 in August 2010), *id.* at 730 (rating plaintiff's GAF a 52 in August 2011)), but the ALJ gave Dr. Quirk's opinion no weight. *Id.* at 29.

The ALJ notes the conclusions presented by Dr. Quirk on the check-box form, which he completed on December 6, 2011, are inconsistent with a GAF of 55. *Id.* While a GAF score of 41-50 is indicative of "serious symptoms," such as suicidal ideation or being unable to maintain employment (DSM-IV at 34), a score of 51-60 evidences only "moderate symptoms," such as infrequent anxiety attacks or clashing with co-workers (*id.*), and a score of 61-70 is indicative of "mild symptoms" such as depression or occasionally missing work. *Id.* Although a GAF of 55 implies only moderate impairment, the checkbox form indicates plaintiff's mental capacity "effectively precludes [him] from performing the activity in a meaningful manner" for fifteen of twenty mental activities listed, without providing any substantial explanation for these designations. AR at 745-748.

The ALJ stresses Dr. Quirk's conclusions are based "entirely on claimant's subjective complaints" made during a thirty minute interview (*id.* at 29, 738) and not based on any formal psychometric tests. *Id.* at 29, 749; *see Matney*, 981 F.2d at 1020 (discounting of treating physician opinion appropriate when doctor saw claimant "one time and produced a brief report" which was based mostly on the subjective complaints of the claimant). Furthermore, the ALJ contends Dr. Quirk's assertions that plaintiff is "totally disabled without consideration of any past or present drug and/or alcohol use, [which] is not a material cause of this individual's disability" (*id.* at 752), and that plaintiff "is not using drugs and/or alcohol" (*id.*), are "unsupported by the entire record as a whole." *Id.* at 29. The ALJ recounts plaintiff's extensive substance abuse history (*id.*) and concludes, "Dr. Quirk has no basis for his statement" whether or not it is correct. *Id.* The ALJ's contention is supported by plaintiff's positive test for marijuana use only

five months prior to Dr. Quirk's evaluation (*id.* at 28, 724, 741), plaintiff's admission at the hearing that he still occasionally drinks alcohol (*id.* at 52), and the July 2011 emergency room assessment listing plaintiff as a moderate risk for substance abuse. *Id.* at 728. Dr. Quirk saw plaintiff for a second thirty-minute appointment on January 5, 2012, but no second Psychiatric Impairment Questionnaire check form was generated from this meeting. *Id.* at 757. Notably, Dr. Quirk's diagnosis on January 5, 2012 is modified to include a history of polysubstance abuse in direct contradiction to his previous assertion. *Id.*

Defendant emphasizes that Dr. Quirk's checkbox form conclusions are unconnected to any formal clinical testing and based solely on claimant's subjective complaints, as the ALJ noted. D. Mem. at 17, 21-23; AR at 29. An "ALJ may 'permissibly reject[ ] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions.'" *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996)). And it is "reasonable to question the reliability of a physician's opinion based only on [claimant's] complaints" when claimant's credibility is substantially undermined by the record as was the case here. *Brawner v. Sec'y of Health & Human Servs.*, 839 F.2d 432, 434 (9th Cir. 1988); *see supra* Section IV.A. For all the forgoing reasons, the ALJ properly considered and rejected Dr. Quirk's December 6, 2011 opinion.

### 2. Dr. Ngati's August 29, 2010 Opinion

In contrast to Dr. Quirk's opinion, which the ALJ gave no weight, Dr. Ngati is one of three non-treating physicians who provide opinions to which the ALJ accorded great weight. AR at 30. Plaintiff argues the ALJ "credited only selected aspects of Dr. Ngati's opinion, [and] fail[ed] to provide any rationales for having excised other parts" when determining plaintiff's RFC. P. Mem. at 16, 19. The court disagrees.

The Social Security Administration ("SSA") sent plaintiff to Dr. Ngati for an examination to assess his SSI claim. *Id.* at 603-607. After reviewing SSA documentation and soliciting a detailed history from plaintiff, Dr. Ngati diagnosed plaintiff with bipolar disorder not otherwise specified, psychosis not otherwise specified, polysubstance abuse in remission per claimant, and a GAF of 48-50. *Id.* at 606. Although plaintiff presented with poor eye contact, childlike behavior, a depressed mood, and restricted affect at times, he was well groomed, somewhat polite and cooperative, and well oriented. *Id.* at 605. As the ALJ noted, based on plaintiff's examination status, Dr. Ngati opined "the claimant's ability to perform simple and repetitive tasks is not limited." *Id.* at 606; *see id.* at 30.

Contrary to plaintiff's assertions, the ALJ accurately summarizes Dr. Ngati's other conclusions as indicating:

> the claimant has moderate limitations in the ability to do the following: perform detailed and complex tasks; accept instructions from supervisors, interact with coworkers, and the public; and maintain regular attendance in the workplace and complete a normal workday or workweek without any interruption from a psychiatric condition. Lastly, Dr. Ngati stated that the claimant has ***moderate to severe*** limitations in the ability to perform work activities on a consistent basis without special or additional instruction.

AR at 30 (emphasis added); *see* AR at 606-07; P. Mem. at 19.

The record does not reflect that the ALJ, when formulating plaintiff's RFC, failed to consider plaintiff's limitations as described in Dr. Ngati's opinion. The ALJ's hypothetical posed to the vocational expert ("VE") asked about an individual of plaintiff's age who had no relevant work experience and moderate limitations including: the need for "special or additional instructions from time to time" without which his ability to perform would be severely to moderately

1  limited; difficulty maintaining a standard workweek which would cause problems
2  from time to time but not preclude him from generally keeping a regular work
3  schedule; and an inability to interact with the general public and limited ability to
4  work with others.  AR at 56.  The VE stated that such a hypothetical person would
5  be able to work as a hand packager, night cleaner, or machine feeder.  *Id.* at 57.

6  When the more severe limitations of frequently forgetting instructions,
7  frequently needing supervision, and missing three days per month of work were
8  added to the hypothetical, the VE found no work could be maintained by the
9  individual.  *Id.*  Plaintiff stresses that the addition to the first hypothetical of just
10  the single severe limitation requiring a supervisor to intervene more than once a
11  week to instruct a substantially off-task hypothetical individual would preclude
12  that individual from all work.  P. Mem at 19; *see* AR at 58-61.  But Dr. Ngati's
13  assessment does not specify how often a supervisor would need to direct plaintiff
14  or how far off task plaintiff would go in a job featuring simple repetitive tasks.
15  While there is some evidence to suggest that plaintiff's limitations may be as
16  severe as those in the second hypothetical (AR at 605-606, 622, 763), the record,
17  taken as a whole, equally supports the less severe limitations put forth in the first
18  hypothetical.  *Id.*  Since the evidence can reasonably support either affirming or
19  reversing the ALJ's decision, the court must affirm the judgment of the ALJ.  *See*
20  *Aukland*, 257 F.3d at 1035.

21  Furthermore, an ALJ's incorporation of an examining physician's findings
22  into his overall analysis of the record in order to formulate a claimant's RFC does
23  not require the ALJ to include verbatim each and every limitation as set forth by
24  each and every opinion considered.  *See Stubbs-Danielson v. Astrue*, 539 F.3d
25  1169, 1174 (9th Cir. 2008) (holding ALJ's RFC "adequately captures [specific]
26  restrictions related to concentration, persistence, or pace where the assessment is
27  consistent with [general] restrictions identified in the medical testimony"); *Roe v.*
28

1  *Chater*, 92 F.3d 672, 676 (8th Cir. 1996) ("While the hypothetical question must
2  set forth all the claimant's impairments, [citation omitted], it need not use specific
3  diagnostic or symptomatic terms where other descriptive terms can adequately
4  define the claimant's impairments."); *Redd v. Astrue*, 2012 WL 846458, at *3
5  (C.D. Cal. Mar. 13, 2012) (holding limitations to workplace stress and ability to
6  maintain concentration "were adequately captured by an RFC assessment
7  restricting Plaintiff to simple repetitive tasks with only occasional interaction with
8  the public, coworkers, and supervisors"). In formulating his RFC, the ALJ did
9  not, in whole or selectively, reject Dr. Ngati's opinion.

**C. The ALJ Erred at Step Two by Failing to Address Plaintiff's Diagnosed Personality Disorder**

Plaintiff argues the ALJ erred at step two in failing to determine that in addition to depression, paranoid schizophrenia, and history of polysubstance dependance, plaintiff suffers from a severe personality disorder. P. Mem. at 12-15, 21. The court agrees.

To establish a medically determinable physical or mental impairment, it must be supported by objective medical evidence. *See* 20 C.F.R. 416.908 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms"); *see generally Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("The claimant carries the initial burden of proving a disability."). Therefore, "a medical opinion offered in support of an impairment must include 'symptoms [and a] diagnosis.'" *Ukolov v. Barnhart*, 420 F.3d 1002, 1006 (9th Cir. 2005). Here, plaintiff was diagnosed with some form of antisocial personality disorder, sometimes with paranoid and narcissistic features, on several occasions by no less than five psychologist. P. Mem. at 15; AR at 502-03, 514-15, 563-64 (diagnosing antisocial personality disorder); *id.* at 591 (same); *id.* at 594 (same); *id.* at 597

(same); *id.* at 613 (same); *id.* at 730 (same).[6]

At step two, the ALJ considers the severity of the claimant's impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920 (a)(4)(ii). An impairment is severe if it significantly limits a claimants "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).[7] "An impairment . . . may be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (internal quotation marks omitted). Step two is "a de minimis screening device [used] to dispose of groundless claims." *Smolen*, 80 F.3d at 1290. When it is not possible to make a clear determination regarding the effect of an impairment, the ALJ's analysis should proceed past step two. *Id.*; SSR 85-28. Here, several clinicians make note of the impact the personality disorder has on plaintiff's ability to "[r]espond[] appropriately to supervision, co-workers and usual work situations" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); *see* AR at 606-07, 624, 763, 765. Clearly, plaintiff's diagnosed personality disorder is more than a de minimis impairment. *See Smolen*, 80 F.3d at 1290.

Defendant argues if the ALJ did err at step two the error is harmless. D. Mem. at 13; *See Burch*, 400 F.3d at 682 (holding an error by ALJ at step two

---

[6] Notably, the "Axis II" section, which relates to such personality disorders, was marked "deferred" on the form completed by Dr. Nagati – one of the three non-treating physicians whose opinions the ALJ gave great weight. AR at 606; *see* P. Mem. at 13 n.5 (discussing Axes I and II assessments under the DSM-IV).

[7] Examples of basic work activities include: "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).

harmless because the step was resolved in plaintiff's favor).  Defendant contends that once the ALJ found the claimant suffered from other severe impairments, in assessing plaintiff's RFC "the ALJ considered the functional effect of all his impairments including the personality disorders."  D. Mem. at 13; *see* Social Security Ruling 96-8p.  Plaintiff disagrees, arguing the ALJ failed to consider the functional effect of his personality disorder, most notably the disorder's impact on plaintiff's behaviors such as his need to exaggerate the truth and manipulate others.  P. Mem. at 15; *see  Carr*, 2009 WL 3112400, at *8 ("[T]he ALJ notes many times that Plaintiff was repeatedly diagnosed with antisocial personality disorder, but he wholly fails to discuss the social limitations that were attached to that diagnosis.").  *But see Giordano v. Providence Health Sys.*, 747 F. Supp. 2d 1137, 1146 (D. Alaska 2010) (refusing to award benefits under claimant's long-term disability plan because malingering is not excusable even if mental illness is its root cause).  If the ALJ's step two error may have affected his step three analysis or resulted in a less restrictive RFC assessment than the record supports, the error cannot be deemed harmless.  *See Stout v. Comm'r*, 454 F.3d 1050, 1056 (9th Cir. 2006) (reversing and remanding because step two error caused vocational hypothetical to omit key limitation.)

### 1. **Impact on Step Three Analysis**

A step three analysis must take into account not only the claimant's individual severe impairments, but also the combination of these impairments.  20 C.F.R. § 404.1526(a) (requiring a step three review of "whether the combination of [claimant's] impairments is medically equal to any listed impairment"); *see also Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir.1987).  An ALJ may not "fragmentize[]" the claimant's illnesses when "evaluating their effects."  *Beecher v. Heckler*, 756 F.2d 693, 694-95 (9th Cir.1985) (quoting *Dressel v. Califano*, 558 F.2d 504, 508 (8th Cir.1977)).  By failing to account for

plaintiff's severe personality disorder at step two, the ALJ could not appropriately assess whether plaintiff's combined impairments medically equaled Listing 12.04, 12.05, or 12.08. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00.

### 2. Impact on RFC Assessment

While the ALJ did, as defendant argues, "repeatedly acknowledge that [p]laintiff had been diagnosed with antisocial personality disorder" (D. Mem. at 12), the ALJ also continually discounted the functional effect of this disorder. *See* AR at 25-26 (analyzing step three and paragraph B criteria without reference to the diagnosed disorder); *id.* at 28-30 (ignoring the possible effect the disorder had on several GAF determinations which bordered between severe and moderate, including two squarely in the severe category); *id.* at 30, 624, 763 (finding no support for the State Agency's medical consultant's two-hour interval limitation when plaintiff's lack of credibility likely caused ALJ to minimize evidentiary support such as Dr. Pierce's "extreme limitation" notation and the 2010 case analysis finding plaintiff incapable of "a normal 40 hour workweek"); *id.* at 56, 592 (omitting characteristics such as "characterological disrespect/disregard for societal rules and the rights of others" from vocational hypothetical) (quoting Dr. Simon's April 13, 2010 assessment of plaintiff). By failing to account for plaintiff's severe personality disorder at step two, the ALJ's RFC may not account for additional legitimate limitations and may be less restrictive than the record supports.

In sum, the ALJ's failure to include plaintiff's personality disorder in step two cannot be deemed a harmless error because the impact of this error on the ALJ's step three analysis and RFC assessment is unclear.

\ \ \

\ \ \

## V.

## **REMAND IS APPROPRIATE**

The decision whether to remand for further proceedings or reverse and award benefits is within the discretion of the district court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). It is appropriate for the court to exercise this discretion to direct an immediate award of benefits where: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinions; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014) (setting forth three-part credit-as-true standard for remanding with instructions to calculate and award benefits). But where there are outstanding issues that must be resolved before a determination can be made, or it is not clear from the record that the ALJ would be required to find a plaintiff disabled if all the evidence were properly evaluated, remand for further proceedings is appropriate. *See Benecke v. Barnhart*, 379 F.3d 587, 595-96 (9th Cir. 2004); *Harman v. Apfel*, 211 F.3d 1172, 1179-80 (9th Cir. 2000). In addition, the court must "remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021.

Here, as set out above, remand is appropriate because there are outstanding issues that must be resolved before it can be determined whether plaintiff is disabled, including further development of the record. The ALJ must reconsider the medical records in light of the effect of plaintiff's severe personality disorder, and, if appropriate, further develop the record in this regard. Additionally, in light of plaintiff's severe personality disorder, the ALJ must reassess whether plaintiff's

combined impairments medically equal any Listing or whether a more restrictive RFC is warranted. The ALJ shall then proceed through steps four and five to determine what work, if any, plaintiff is capable of performing.

## VI.
## CONCLUSION

IT IS THEREFORE ORDERED that Judgment shall be entered REVERSING the decision of the Commissioner denying benefits, and REMANDING the matter to the Commissioner for further administrative action consistent with this decision.

DATED: July 8, 2015

_____
SHERI PYM
United States Magistrate Judge